## Thompson v. Commonwealth.

(Decided November 11, 1930.)

WAUGH & HOWERTON for appellant.

J. W. CAMMACK, Attorney General, and DOUGLAS VEST for appellee.

Opinion of the Court by Chief Justice Thomas— Affirming.

At his trial under an indictment accusing him of the crime of murdering Paul Jones, the appellant, Marvin Thompson, was convicted in Boyd circuit court of voluntary manslaughter and punished by confinement in the penitentiary for two years. On this appeal by him, his counsel argues but one question for a reversal, which is that the evidence is insufficient to sustain a conviction, and that (a) appellant's motion for a peremptory instruction for acquittal should have been sustained, but, if mistaken in that, then (b) the verdict is flagrantly against the evidence, the disposition of which calls for a summary of the evidence.

Appellant lived and had done so from infancy with his grandparents in a rural section of Boyd county. But a short distance therefrom his mother, whose second marriage was to a Mr. White, resided with her family and husband, among whom was a daughter 14 years of age, who was a half-sister to appellant. Between the residences of appellant's grandparents and that of the White family was the residence of one Bud Bartram, and

the deceased, Paul Jones, boarded at the latter's home. For some time prior to the homicide the deceased had been calling upon and paying attentions to Shirley White, the half-sister of appellant, and it is claimed that Mrs. White, appellant's mother, objected thereto, mainly because Jones was 31 years of age and as she thought was too old for a companion for her 14 year old daughter. Late in the evening of the fatal day, which was on Monday, appellant went to the home of his stepfather and sat around the fire with other members of the family for some time, when the deceased and a companion appeared and took their seats around the fire with the other members of the gathering. Later Mrs. White arose and went through the dining room adjoining the one she left and into the kitchen beyond the dining room, some of the witnesses saying that she began to cry after the deceased made his appearance, but the testimony in support of that fact is not altogether convincing to us. At any rate, directly after the departure of Mrs. White the deceased also left the room and went in the direction of the kitchen.

In the meantime appellant remained sitting in the room where the party was gathered and, using his language, he said: "I just sat there for a few minutes—not more than five minutes. I heard a racket in there, and I run in." Upon being asked to tell what he saw, his answer was: "Well, he had ahold of my mother's neck, and she was kinda hollering. I run around he rammed one hand up to his breast and went on to me with the other hand, and I shot him. I shot him back to the chair, and then shot three more shots at him. He was standing up on the second—standing up facing the—facing there. He was standing up. When I came, I went back of the chair then." No one was present in the kitchen except deceased, appellant, and his mother, and the latter's account of the transaction was that she was sitting in a chair by the dining table crying when deceased made his appearence and asked her what was the matter, when she answered: Because you have taken her (the 14 year old daughter) on to Huntington against my will, and you have kept her out against dark, and you know I wasn't willing for her to go. He jumped and grabbed me by the neck of the dress here. I don't know just what it was —I was so excited—and was crying anyway—didn't pay

any attention much to what he was a-doing." Continuing her testimony,. she testified:

"After he grabbed you by the neck of the dress, did he shake you? A. Yes, sir, he shook me.

"Q. What happened then about that time? A. Someone came—entered the door. I couldn't—I was so excited—tell how—who it was, and they fired a shot someway—shot something. I fell back in the chair I think—chair or something. I couldn't say just who it was shot him—sunk down in the chair.

"Q. Did you know that it was Marvin doing the shooting? A. No, sir, I didn't. Couldn't tell who it was."

At this point it should be stated that on the day prior to the killing, which was on Sunday, the deceased took the daughter in an automobile to Ashland and to which we fail to find any objections by any one in the record. However, instead of returning immediately from Ashland, the two extended their trip to Huntington, W. Va., and did not return until about 8 o'clock on that Sunday night. Although thus belated, there is not a suspicion arising from any evidence in the record that anything improper occurred between deceased and the daughter during that Sunday afternoon drive; and it also may be said that no one in the room where the party was gathered heard any noise whatever in the kitchen where the homicide was committed, and two or three persons who were present in the sitting room, including Mr. White, appellant's stepfather, were not introduced as witnesses by either side, and those who did testify said that the first thing that attracted their attention was the shooting.

Appellant also testified that as he passed the Bartram home where the deceased temporarily resided, the latter accosted him and, as told by appellant, this occurred:

"Well, he come out and asked me about me interfering in his business. I told him my sister— I told him I didn't like for him to go with my sister.

"Q. Then what did he say? A. He says, 'I am just as good as she is, and I will go with her when I please.'

"Q. Did he say anything further? A. And he says, if I don't like it, says, 'I will kill you some time,' just like that.

"Q. What did you do when he said that? A. I just went up to the house—Jim White's."

It appeared that others were present at that time, and appellant introduced none of them to sustain his testimony as to what occurred at that time. He meekly submitted to the threats and insults, although on departing from his home he had armed himself with his pistol, which he then had upon his person; the deceased not being armed at that time, nor at the time when he was killed.

The coroner of the county, and its jailer, testified that they had a conversation with appellant shortly after the killing, and perhaps the next day, in which he freely and voluntarily told them that he had shot and killed deceased in the kitchen of his stepfather, and on being asked why he did so, he said: "He had threatened my life at one time, and then I understood that he had a bad disease, and I didn't want him with my sister. I asked him when and where they were when Paul threatened him. He said they were out in the road. I asked him what attitude that Paul seemed to be or if he seemed to be mad. He said, 'No,' they were having friendly conversation. I asked him if he had ever had any quarrel or fight with Paul, and said he hadn't but said he told him he was going to kill him. He said he just told him and rushed away."

Both the coroner and the jailer were positive that appellant made no mention at that time of any attempted assault by the deceased upon his mother in the kitchen of her residence, as was somewhat feebly told, as we conclude, by her at the trial. Moreover, the mother testified at the coroner's inquest, and it is shown by herself that in the testimony then given by her she made no mention of any assault by the deceased of any character upon her in the kitchen, and she gave as a reason for not doing so that her lawyer had so instructed her. Her testimony in that regard, as contained in the record, was:

"Q. When you told him that you did not want him to take your girl to Huntington, he just jumped out of the chair and grabbed you? A. He just

jumped a step, I know. There was one step from one side of the table to the other.

"Q. You did not tell about that on the other trial did you? A. No, sir, I did not. My lawyer told me not to.

"Q. Your lawyer told you not to? A. Yes, sir."

With the testimony appearing as so briefly outlined, it is strenuously argued that the trial court, as well as this one, should accept as absolutely true the testimony given by appellant and his mother at his trial, and thereby disregard its inherent improbability as well as the glaring contradictions of both of them, to say nothing about the hesitating fashion in which they both testified, and which testimony in chief was drawn from them by a series of skillfully framed questions tenderly propounded. Whether or not appellant's testimony in chief, and that of his mother, if entirely uncontradicted by other testimony or circumstances, would entitle him to an instruction directing his acquittal, we need not determine, since it is undoubtedly true that such testimony is contradicted by former statements of appellant and former testimony of the mother, and their story as to what happened in the kitchen at the time of the killing is itself highly improbable.

Much is found in brief of counsel that is not sustained by the record, and some conclusions therein are not supported by the facts as testified to by the witnesses; but all of which may be attributed to counsel's zeal and interest in their client's cause and for that reason excusable. For instance, it is strenuously argued that appellant is only a 16 year old youth, when his mother testified positively to facts showing that he was at least 18 years old. Counsel also indulges in much abuse of the deceased by characterizing him as a bootlegger and afflicted with a loathsome disease, when we fail to discover a word in the record to sustain either charge, except the statement made by appellant to the coroner that he (appellant) had heard that deceased was so afflicted. It is likewise stressed in brief that appellant is a high school student and that his conviction would take him out of school and imperil his education, when the undisputed testimony shows that he left the high school in 1927, and has never returned to it. We

refer to such portions of the brief only for the purpose of accounting for counsel's strenuous argument that a directed acquittal should have been given. However, our impartial review of the record does not so convince us, nor does it convince us that the verdict is flagrantly against the evidence, and which disposes of the only grounds urged for reversal.

Wherefore, the judgment is affirmed.